UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROBERT H. STEINFELD

                      Plaintiff,

    *- against -*

IHS HEALTH INCORPORATED,

                      Defendant.

10 Civ. 3301 (CS) (LMS)

**REPORT AND
RECOMMENDATION**

TO:   **THE HONORABLE CATHY SEIBEL,
      UNITED STATES DISTRICT JUDGE**

## I.   INTRODUCTION

Before the Court is defendant IMS Health Incorporated's (hereinafter "IMS") motion to enforce a settlement agreement between the parties. Through an August 23, 2013, exchange of e-mails, the parties entered into a preliminary settlement agreement, which IMS now contends was intended by both parties to be binding upon them. Plaintiff Robert Steinfeld, on the other hand, protests that the e-mails amounted to nothing more than a non-binding outline for a formal settlement agreement that was to be drafted at a later date. He also claims that, in drafting the preliminary agreement, the parties operated under a mutual mistake. For the reasons set forth herein, I conclude, and respectfully recommend that Your Honor should conclude, that IMS's motion should be denied on the ground that the parties did operate under a mutual mistake, despite the existence of a binding preliminary agreement. In the event that Your Honor disagrees with my recommendation and grants IMS's motion, I conclude, and respectfully recommend that Your Honor should conclude, that the general releases discussed in the preliminary agreement do not terminate the Employment Agreement or the Amended Change-in-Control Agreement, which form the basis for this action.

## II.    FACTS AND PROCEDURAL HISTORY

From 2000 to 2009, IMS employed Steinfeld in various capacities – Senior Vice President, General Counsel, and Corporate Secretary.  See Docket Entry #24, Stipulation.  The timing and circumstances of Steinfeld's exit from IMS are at issue in this litigation.  Steinfeld's employment with IMS was subject to an Employment Agreement and an Amended Change-In-Control Agreement, which obligated IMS to, among other things, (1) reimburse Steinfeld, his spouse, and his dependants for their ongoing health care premiums, see Docket Entry #105, Exh. 1, Employment Agreement at § 5(b)(iv); (2) indemnify Steinfeld for certain tax liabilities, see id. at § 9(b), 11(a); and (3) pay Steinfeld's legal fees and costs in connection with legal proceedings concerning the interpretation or enforcement of the Employment Agreement or the Amended Change-In-Control Agreement.  See Docket Entry #1, Exh. B, Amended Change-in-Control Agreement at § 5.

The Amended Change-in-Control Agreement, which the parties entered into on October 24, 2008, also guaranteed additional benefits to Steinfeld in the event that he was employed by IMS during a change in control of the corporation, or a potential change in control from which a change in control directly resulted.  See Docket Entry #39, Stipulation and Order; Docket Entry #1, Exh. B, Amended Change-in-Control Agreement at § 2.  In the context of the Amended Change-in-Control Agreement, IMS would experience a change in control if, among other things, it merged or consolidated with another company.  See id.; Docket Entry #1, Complaint at ¶ 19.  A potential change in control of IMS took place on October 20, 2009, and a change in control resulted therefrom on or about February 26, 2010.  See Docket Entry #24, Stipulation and Order at ¶ 1.  This action specifically concerns whether Steinfeld's employment terminated before or after the October 20, 2009, potential change in control.  See id. at ¶ 2.  Steinfeld claims

that he did not leave IMS until after the potential change in control and, therefore, that he is entitled to additional benefits under the Amended Change-in-Control Agreement.

Following discovery, the parties engaged in settlement discussions, which centered around IMS making a series of equal annual payments to Steinfeld over the course of several years. The parties tinkered with the idea that IMS would purchase an annuity, from which it would pay Steinfeld. See Docket Entry #102, Exh. 1, August 22, 2013, e-mail. While going back and forth over the structure of the annuity, Steinfeld repeatedly made clear that he wanted to limit his tax liability, and sought to have IMS indemnify him from any unforeseen tax consequences resulting from a settlement. See Docket Entry #102, Exh. 1, August 23, 2013 e-mail. IMS responded that it "is neither indemnifying [Steinfeld] for any settlement-related tax matters nor making any representations to [Steinfeld] with respect thereto." Docket Entry #102, Exh. 1, August 23, 2013, e-mail. Eventually, the parties moved to an arrangement in which IMS would make equal, annual payments to Steinfeld for a period of seven years. After some back and forth, IMS's counsel sent the following e-mail to Steinfeld's counsel:

> Pursuant to our email exchanges this afternoon, I have further revised the proposal below. Please confirm your agreement on Mr. Steinfeld's behalf, to these terms, and we can then together advise the Court that the litigation . . . has been settled, and the trial . . . need not go forward:
>
> 1. Commencing in December, 2014, and in December of each of the next six successive years, through and including December, 2020, IMS shall pay Mr. Steinfeld the sum of $315,000 per year (for an aggregate payout of $2,205,000).
>
> 2. The parties shall execute mutual general releases together with a Stipulation of Discontinuance of the Litigation with Prejudice as part of the formal settlement agreement. The general release in favor of IMS shall extend to its parent, subsidiaries, and affiliates, and to its and their officers, directors, employees and agents.
>
> 3. Judge Siebel [sic] shall retain jurisdiction to hear and determine any disputes arising out of or relating to the parties' settlement agreement.

3

> 4. These terms shall be memorialized in a formal written settlement agreement executed by the parties that also contains typical "boilerplate" provisions found in such agreements.

Docket Entry #102, Exh. 2, August 23, 2013, 3:15 PM e-mail.  Steinfeld's counsel quickly responded: "I confirm my agreement on Mr. Steinfeld's behalf to these terms."  Docket Entry #102, Exh. 2, August 23, 2013, 3:22 PM e-mail (taken together, the August 23, 2013, 3:15 PM e-mail from IMS's counsel and the August 23, 2013, 3:22 PM e-mail from Steinfeld's counsel will hereinafter be referred to as "the Preliminary Agreement").  Thereafter, the parties jointly contacted Judge Seibel's chambers, notifying a member of her staff that they had settled the matter.  Judge Seibel issued an order discontinuing the matter with leave to reopen within thirty days.  Docket Entry #30, Order.

IHS's counsel drafted a formal settlement agreement (hereinafter "the Draft"), Docket Entry #102, Exh. 3, Settlement Agreement, which contained the same payment schedule agreed upon in the Preliminary Agreement.  The Draft also contained general releases, and the release to be signed by Steinfeld (hereinafter "the Draft Release") provided that he would release IMS

> from any and all claims, demands, causes of action, and liabilities of any kind whatsoever (upon any legal or equitable theory, whether contractual, common-law, statutory, federal, state, local, or otherwise), whether known or unknown, by reason of any act, omission, transaction or occurrence which [Steinfeld] ever had, now has or hereafter can, shall or may have against [IMS] up to and including the date of the execution of this General Release.

Id. at 8.  IMS's counsel transmitted the Draft to Steinfeld's attorney, making clear that it was not intended to be a final document and inviting comments.  See Docket Entry #102, Exh. 3, September 6, 2013, e-mail.

Rather than provide comments on the Draft, Steinfeld's counsel responded that he believed that the agreed upon payment schedule violated 26 CFR § 1.409A-3(g), which he

4

understood to "require[] a settlement payment in a compensation-related litigation to be paid by the end of the year in which the settlement was reached." Docket Entry #102, Exh. 8, September 13, 2013, e-mail at 1. Steinfeld's counsel explained that if the settlement was paid out over more than one year, Steinfeld would be subject to a penalty of 20% of the gross settlement amount under 26 U.S.C. § 409A(a)(1)(B)(i)(II). Steinfeld's counsel added that IMS would be required to indemnify Steinfeld for any such penalty pursuant to section 11(a) of the Employment Agreement. See id. He therefore suggested that the parties negotiate a new lump sum payment, asserting that, pursuant to the Employment Agreement, IMS would be required to indemnify Steinfeld for any resulting excise tax applicable under 26 U.S.C. § 280G. See id. at 2.

IMS's counsel refused to renegotiate the settlement, instead arguing that the parties were bound by the terms of the Preliminary Agreement. See Docket Entry #102, Exh. 9, September 16, 2013, e-mail. He added:

> Even assuming you are correct that the deal we agreed upon could create . . . tax problems, your assumption that those are IMS's problems because of some continuing obligation to indemnify [Steinfeld], and to gross him up [sic] for any adverse tax consequences is mistaken.
>
> . . . the terms we agreed upon unambiguously call for the exchange of general releases between the parties. Those general releases would necessarily include releases of any continuing IMS contractual tax indemnification obligations to [Steinfeld].

Docket Entry #102, Exh. 9, September 16, 2013 e-mail. Steinfeld's attorney disagreed that IMS had been released from its obligation to indemnify Steinfeld from any tax liability resulting from the settlement payments, contending that the release contemplated in the Preliminary Agreement pertained only to those claims in existence at the time of its execution and, therefore, it "would not effect a release of any claims [Steinfeld] may have against IMS *after* the date of the execution of such release." Docket Entry #102, Exh. 11, Sept. 17, 2013, e-mail (emphasis in

5

original).  Steinfeld's counsel explained that the release called for by the Preliminary Agreement "was never intended . . . to amend his Employment Agreement or release IMS from its continuing contractual obligations under his Employment Agreement which have not yet become claims and which survive the term of Steinfeld's employment." Id.

On September 20, 2013, IMS notified Judge Seibel that the parties had encountered difficulty finalizing the settlement agreement because Steinfeld refused "to execute the parties' formal agreement settling the above-referenced matter." Docket Entry #84.  Steinfeld responded that "[t]here is no settlement agreement, formal or otherwise." Docket Entry #87, September 23, 2013, letter at ¶ 3.  He added that "[t]here is merely a woefully inadequate and ambiguous draft prepared by IMS that, among its other deficiencies, is designed to walk [Steinfeld] into potential seven-figure tax liabilities for which he is contractually not responsible." Id.  Steinfeld added that the parties' disagreement over the state of the settlement stemmed from "IMS's unreasonable and improper refusal to honor its pre-existing contractual obligations to indemnify [Steinfeld] for . . . tax liabilities that may arise *after* execution of a settlement agreement and releases." Id. (emphasis in original).  According to Steinfeld, "IMS is effectively seeking an amendment of [the] Employment Agreement in the guise of a release which would deprive [Steinfeld] not only of these indemnities but potentially of other continuing contract rights that have nothing to do with this action." Id.

IMS's counsel subsequently informed Judge Seibel that he "believe[d] the parties indeed settled the action pursuant to an agreement properly documented in emails between [counsel for the parties] on August [23.]" Docket Entry #88, September 24, 2013, letter.  On the same day, IMS's counsel apparently informed Steinfeld's counsel that, based upon Steinfeld's agreement to execute a general release, IMS was no longer obligated to pay the relevant health insurance

6

premiums or reimburse Steinfeld for his legal fees in the instant matter.  See Docket Entry #91, October 8, 2013, letter at 2-3.  IMS requested permission to move to enforce the Preliminary Agreement as a settlement agreement, and Steinfeld asked to move to compel IMS to resume meeting its obligations under the Employment Agreement and the Amended Change-in-Control Agreement.  Judge Seibel referred the matter to me for purposes of issuing a Report and Recommendation on the motion to enforce the settlement agreement.  Docket Entry #94, Order of Reference.

On November 4, 2013, IMS moved to enforce the Preliminary Agreement as set forth in the August 23, 2013, e-mails.  Docket Entries 101-03.  Steinfeld opposed the motion, Docket Entries #104-07, claiming that the parties never intended to be bound by the Preliminary Agreement.  Docket Entry #104, Memo. of Law in Opp. at 1-20.  He alternatively argues that the Preliminary Agreement is voidable due to a mutual mistake.  Id. at 21-23.  Steinfeld finally argues that, even if the Preliminary Agreement is binding, he never agreed to release IMS from its continuing obligations to him under the Employment Agreement and the Amended Change-in-Control Agreement.  Id. at 9-17.

## III.   DISCUSSION

### A.   Preliminary Agreements are Contracts

The Second Circuit has made clear that "[a] district court has the power to enforce summarily, on motion, a settlement agreement reached in a case that was pending before it." Meetings & Expositions, Inc. v. Tandy Corp., 490 F.2d 714, 717 (1974).  The Court addresses the contentions in this diversity matter under New York law, which the parties implicitly agree

controls here.[1]  In New York, settlement agreements are treated as "contracts and must therefore

be construed according to general principles of contract law." Red Ball Interior Demolition

Corp. v. Palmadessa, 173 F.3d 481, 484 (2d Cir. 1999) (Opn. by Sotomayor, J.).  "To establish

the existence of an enforceable agreement, [the proponent of the agreement] must establish an

offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound."

Kowalchuk v. Stroup, 61 AD3d 118, 121 (1st Dept. 2009).  "[T]he fundamental basis of a valid,

enforceable contract is a meeting of the minds of the parties . . . on all essential terms." Schurr

v. Austin Galleries of Illinois, Inc., 719 F.2d 571 (2d Cir. 1983) (citing Ogden v. Allen, 21 AD2d

87, 89 (3d Dept. 1965), aff'd 14 NY2d 349 (1964)).

Whether the parties came to a meeting of the minds on all essential terms is a question of

fact that must be resolved through an analysis of the totality of the circumstances, including the

parties' acts, expressions, situations, and objectives.  See Bazak Int'l Corp. v. Tarrant Apparel

Group, 378 F.Supp.2d 377, 389 (S.D.N.Y. 2005); United States v. Sforza, 326 F.3d 107, 116 (2d

Cir. 2003).  "Of course, not all terms of a contract need be fixed with absolute certainty; at some

point virtually every agreement can be said to have a degree of indefiniteness." Express

Industries and Terminal Corp. v. New York State Dept. of Transp., 93 NY2d 584, 590 (1999).

"While there must be a manifestation of mutual assent to essential terms, parties also should be

held to their promises and courts should not be pedantic or meticulous in interpreting contract

expressions." Id.  Thus, a court interpreting such an agreement has a "responsibility of

---

[1]  The parties implicitly agree upon the application of New York law through their
reliance primarily upon New York case law or federal decisions applying New York law.  Such
agreement upon "the application of the forum law . . . concludes the choice of law inquiry.' "
Texaco A/S (Denmark) v. Commercial Ins. Co. of Newark, NJ, 160 F.3d 124, 128 (2d Cir. 1998)
(quoting American Fuel Corp. v. Utah Energy Dev. Co., 122 F.3d 130, 134 (2d Cir. 1997)).

effectuating the true intent of the parties . . . , as opposed to giving weight to provisions of the agreement which may not have been material and which may be seized upon by a party to obtain relief to which he [or she] may not be legitimately entitled." Furgang v. Epstein, 106 AD2d 609, 609 (2d Dept. 1984).

The August 23, 2013, e-mail exchange between counsel bears the hallmarks of a contract. The 3:15 PM e-mail from IMS's counsel constituted an offer, setting forth the material terms of the agreement: (1) IMS would pay Steinfeld in seven annual installments of $315,000; (2) the parties would execute mutual general releases and a stipulation of discontinuance of the matter; (3) Judge Seibel would retain jurisdiction over the settlement agreement; and (4) the parties would reduce the terms to writing in a "formal written settlement agreement." Docket Entry #102, August 23, 2013, 3:15 PM e-mail. The responding 3:22 PM email from Steinfeld's counsel, which confirmed Steinfeld's agreement to the terms with an expression of mutual assent, appears to constitute an acceptance. Further, the agreement of an exchange of money for cessation of the action and a release amounts to consideration.

**B.    Types of Preliminary Agreements**

The relevant question is whether the parties intended to be bound by the August 23, 2013, Preliminary Agreement. "Parties to proposed commercial transactions often enter into preliminary agreements, which may provide for the execution of more formal agreements." Adjustrite Systems, Inc. v. GAB Business Systems, Inc., 145 F.3d 543, 547 (2d Cir. 1998). "When they do so and the parties fail to execute a more formal agreement, the issue arises as to whether the preliminary agreement is a binding contract or an unenforceable agreement to agree." Id. Parties may bind themselves to a preliminary agreement even if they plan to later memorialize the agreement in a formal writing. See V'Soske v. Barwick, 404 F.2d 495, 499 (2d

9

Cir. 1968), cert. denied 394 U.S. 921 (1969); Francis v. Home Box Office, 2005 WL 1020863,

*4 (S.D.N.Y. 2005) ("The intent to reduce a valid oral settlement agreement to writing, however,

does not prevent that oral agreement from being enforced."); Grupo Sistemas Integrales De

Telecomunicacion S.A. De C.V. v. AT&T, 1994 WL 463014, *3 (S.D.N.Y. 1994) ("Parties who

intend to be bound by informal agreement are so bound even if they contemplate later

memorializing their agreement in writing.") (Opn. by Wood, J.); Carney v. Carozza, 16 AD3d

867, 868 (3d Dept. 2005).  Such a preliminary agreement is "enforceable even if a more formal

agreement never materializes." EQT Infrastructure Ltd. v. Smith, 861 F.Supp.2d 220, 227

(S.D.N.Y. 2012) (Opn. by Seibel, J.).  However, "[a] contract or stipulation is only enforceable if

it is definite as to all material terms; 'a mere agreement to agree' in the future is unenforceable."

Carney, 16 AD3d at 868.

The Second Circuit generally recognizes that "binding preliminary agreements fall into

one of two categories." Adjustrite, 145 F.3d at 548; see Brown v. Cara, 420 F.3d 148, 153 (2d

Cir. 2005).[2]  In the first category are agreements to which the parties intended to be fully bound;

such an agreement is preliminary "only in the sense that the parties desire a more elaborate

formalization of the agreement." Id. "[W]hen the parties have reached complete agreement

(including the agreement to be bound) on all the issues perceived to require negotiation[, s]uch

---

[2] Noting the constrictive nature of the Second Circuit's binary categorization of preliminary agreements, the New York State Court of Appeals has questioned the effectiveness of such analysis. See IDT Corp. v. Tyco Grp., S.A.R.L., 13 NY3d 209, 213-14 (2009). However, IMS contends that the e-mails constituted a fully binding preliminary agreement of the first type, see Docket Entry #110, Reply Memo. at 5 n 12, and Steinfeld employs the analysis applicable to the first type of preliminary agreement. See Docket Entry #104, Memo. of Law at 4-21.  Therefore, the parties implicitly agree that the dispute is whether the preliminary agreement at issue constituted an agreement of the first type, and, consequently, the effectiveness of the Second Circuit's analysis need not be addressed.

10

an agreement is preliminary only in form – only in the sense that the parties desire a more elaborate formalization of the agreement." Teachers Ins. and Annuity Ass'n of America v. Tribune Co., 670 F.Supp. 491, 498 (S.D.N.Y. 1987) (Opn. by Leval, J.).  A binding preliminary agreement of the first type "is 'complete, reflecting a meeting of the minds on all the issues perceived to require negotiation,' and as such, 'binds both sides to their ultimate contractual objective.' " EQT Infrastructure, 861 F.Supp.2d at 226-27 (quoting Brown, 420 F.3d at 153).

The second type of preliminary agreement, which "is binding only to a certain degree[,] is created when the parties agree on certain major terms, but leave other terms open for further negotiation." Adjustrite, 145 F.3d at 548.  An agreement of the second type only obligates the parties to "negotiate the open issues in good faith in an attempt to reach the . . . objective within the alleged framework." Id. (internal quotation marks and citation omitted; ellipsis in original).

Here, the parties implicitly agree that their dispute concerns whether the Preliminary Agreement was meant to fully bind them and, therefore, whether it was of the first type mentioned. See Docket Entry #110, Reply Memo. at 5 n 12; Docket Entry #104, Memo. of Law at 4-21.  When evaluating the binding effect of a preliminary agreement, a court must look first and foremost to the intent of the parties. Winston v. Mediafare Entertainment Corp., 777 F.2d 78, 80 (2d Cir. 1985).  More specifically, it "must look, not to their after-the-fact professed subjective intent, but their objective intent as manifested by their expressed words and deeds at the time." Grupo Sistemas, 1994 WL 463014 at *3.  Therefore, to establish that a preliminary agreement was not intended to be binding, a party "must do more than merely point to the circumstance that a formal document was contemplated: [he or she] must show either that both parties understood that their correspondence was to be of no legal effect or that [the proponent of the agreement] had reason to know that [the party on the opposite side of the table] contemplated

11

that no obligations should arise until a formal contract was executed." V'Soske, 404 F.2d at 499.

Further, "[t]here is a strong presumption against finding binding obligation in agreements which

include open terms, call for future approvals and expressly anticipate future preparation and

execution of contract documents." Arcadian Phosphates, Inc. v. Arcadian Corp., 884 F.2d 69, 73

(2d Cir. 1989).

### C.    Application

According to Steinfeld, the appropriate tool to evaluate whether the parties intended to be

bound by the Preliminary Agreement is the four-prong test set forth by the Second Circuit in

Winston v. Mediafare Entertainment Corp., 777 F.2d 78 (2d Cir. 1985).  See Docket Entry #104,

Memo. of Law at 3.  According to the Second Circuit's decision in Winston, a

> court is to consider (1) whether there has been an express reservation of the right not
> to be bound in the absence of a writing; (2) whether there has been partial
> performance of the contract; (3) whether all of the terms of the alleged contract have
> been agreed upon; and (4) whether the agreement at issue is the type of contract that
> is usually committed to writing.

777 F.2d at 80.

IMS counters that the factors set forth in Winston are not the proper instrument for

evaluating the parties' intent with regard to the purported settlement agreement.  While IMS

correctly notes that Winston concerned an oral agreement, numerous courts within the Second

Circuit have utilized the Winston factors to assess the binding effect of written preliminary

settlement agreements.  See e.g. O'Connor-Gunn v. Weill Cornell Medical College of Cornell

Univ., 2013 WL 3872220, *3-5 (S.D.N.Y. 2013); Case v. City of New York, 2012 WL 5951296,

*4-8 (S.D.N.Y. 2012); VPP, Inc v. Field, 2006 WL 4730944, *2-4 (E.D.N.Y. 2006); Hostcentric

Technologies, Inc. v. Republic Thunderbolt, LLC, 2005 WL 1377853, *6 n 5 (S.D.N.Y. 2005);

Horphag Research Ltd. v. Henkel Corp., 115 F.Supp.2d 455, 456-58 (S.D.N.Y. 2000) (Opn. by

Mukasey, J.).  IMS claims that such cases are "easily distinguished from the facts presented

here," Docket Entry #110, Reply Memo. at 4, but fails to explain what details distinguish such

decisions from the matter at hand.  In any event, the aforementioned decisions all concerned

motions to enforce written preliminary agreements.  Their distinctions from the instant matter do

not undermine the applicability of Winston here.  Additionally, the factors set forth in Winston

derive from comments a and c to Restatement (Second) of Contracts § 27, which concern when

an oral or written preliminary agreements is binding.  Restatement (Second) of Contracts § 27

comment a, c (1981).  Therefore, the Winston factors appear applicable here.

While the intent of the parties is a close question, the language of the Preliminary

Agreement, the circumstances surrounding its formation, and the actions of the parties following

its formation indicate that the parties intended for the Preliminary Agreement to bind them.

### 1.    Express Language of the Preliminary Agreement

The Court first looks to the language of the Preliminary Agreement, examining whether

either party expressly reserved his or her right not to be bound thereby.  The Second Circuit has

recognized the express language of the agreement as "the most important," Arcadian, 884 F.2d at

72, factor in the Winston analysis.  Accord Adjustrite, 145 F.3d at 549; RKG Holdings, Inc. v.

Simon, 182 F.3d 901, *1 (2d Cir. 1999) (Sotomayor, J. on panel).

Here, the language of the Preliminary Agreement supports the conclusion that the parties

intended to be bound thereby.  First and foremost, neither Steinfeld nor IMS expressly reserved

the right not to be bound by the Preliminary Agreement, an element which courts repeatedly

stress.  See e.g. Powell v. Omnicrom 497 F.3d 124, 130 (2d Cir. 2007); Scarola Reavis & Parent

LLP v. Diggs, 2006 WL 3694583, *2 (E.D.N.Y. 2006).  Comparatively, preliminary agreements

held not to be binding have typically contained explicit reservations of the right not to be bound

until the execution of a formal agreement. See e.g. R.G. Group, Inc. v. Horn & Hardart Co., 751

F.2d 69, 76 (2d Cir. 1984); Reprosystem, B.V. v. SCM Corp., 727 F.2d 257, 262 (2d Cir. 1984),

cert. denied 469 U.S. 828 (1984); Kowalchuk, 61 AD3d at 123. While such factor "is not

dispositive," Brown, 420 F.3d at 154, the e-mails between counsel contained an expression of

committed, mutual assent by the parties. Specifically, IMS's counsel asked Steinfeld's counsel to

"confirm your agreement on Mr. Steinfeld's behalf, to these terms, and we can then together

advise the Court that the litigation . . . has been settled, and the trial . . . need not go forward."

Docket Entry #102, Exh. 2, August 23, 2013, 3:15 PM e-mail. Steinfeld's counsel answered with

a short confirmation. See Docket Entry #102, Exh. 2, August 23, 2013, 3:22 PM e-mail.

Counsel's joint communication to Judge Seibel's chambers that they had settled the

matter further indicates that the agreement was meant to be binding. See Krauth v. Executive

Telecard, Ltd., 890 F.Supp. 269, 294 (S.D.N.Y. 1995) ("the actions of the parties, particularly in

their joint submission to this Court is strong indication of their intent to be bound."); Delyanis v.

Dyna-Empire, Inc., 465 F.Supp.2d 170, 175 (E.D.N.Y. 2006) (parties' communication to the

Court that the matter had settled was evidence that the parties intended to be bound by a

preliminary agreement).

Steinfeld argues that, despite the language of the Preliminary Agreement and the

communication with Your Honor's chambers, a number of other factors indicate that it was not

meant to be binding. Specifically, the Draft contained a merger clause, which at least one court

has held "is a strong indication that the parties did not intend to be bound until the final written

settlement agreement was executed." Cruz v. OneSource Facility Services, Inc., 2005 WL

2923517, *2 (S.D.N.Y. 2005) (Opn. by Preska, J.); but see Kowalchuk, 61 AD3d at 124 ("The

inclusion, in the formal document intended to encompass the terms of an agreement, of the

language that '[t]he Agreement is complete and binding upon its execution by all signatories' is simply insufficient to be treated as an explicit reservation that the parties should not be bound by the terms of their agreement until the written agreement is fully executed.").[3]  The Draft also included a revocation clause, which would have given Steinfeld "7 days to rescind this Release and the Agreement."  Docket Entry #102, Exh. 3, Settlement Agreement at 8.  Several courts have held that such a clause is evidence of an intent not to be bound by a preliminary agreement. See Lyman v. New York and Presbyterian Hospital, 2012 WL 6135354, *5 (S.D.N.Y. 2012) (the inclusion of such a revocation clause in a final settlement agreement "indicates a reservation not to be bound until execution."); accord Cruz, 2005 WL 2923517, at *2.

Citing the Second Circuit's decision in Adjustrite, Steinfeld stresses that IMS's characterization of its 3:15 PM e-mail as a "proposal" and that the Preliminary Agreement did not explicitly indicate that it was meant to be binding are both evidence that the agreement was not intended to bind the parties.  See Docket Entry #104, Memo. of Law in Opp. at 6-7 (citing 145 F.3d at 549-50).  The court in Horphag similarly noted that the language of a preliminary agreement was "notable for its omission of any language that suggests finality or a current willingness to be bound."  115 F.Supp.2d at 457.

The remainder of Steinfeld's arguments, however, are less persuasive.  For instance, he alleges the Preliminary Agreement's requirement that the parties thereafter reduce its terms to a

---

[3]  The merger clause at issue provides: "This Agreement constitutes the entire agreement of the Parties with respect to the matters addressed herein and supersedes all other understandings, representations or agreements of the Parties with respect thereto.  The Parties acknowledge that they have entered into this Agreement in reliance upon their own independent investigation and analysis and that neither has been induced to enter into this Agreement by virtue of, and is not relying upon, any representations or warranties not set forth in this Agreement.  This Agreement may be modified only by a written amendment executed and delivered by the Parties."  Docket Entry #102, Exh. 3, Settlement Agreement § 6.

formal agreement and exchange mutual releases evidenced that the agreement was not meant to be binding.  See Docket Entry #104, Memo. of Law in Opp. at 8.  As mentioned above, a preliminary agreement may be binding even if the parties plan to later draft a formal agreement. See V'Soske, 404 F.2d at 499; Teachers Ins., 670 F.Supp. at 498.  More importantly, the language of the Preliminary Agreement did not condition its power to bind the parties upon the drafting of a formal agreement, stipulation, or release; it instead required the parties to take such actions in performance of the agreement.

Steinfeld also points to that language in the Draft which requires Steinfeld to file a stipulation of discontinuance no more than five days after execution of the Draft.  See Docket Entry #102, Exh. 3, Settlement Agreement at § 1.  Steinfeld appears to claim that such term indicates that the settlement was only binding following execution of the Draft.  However, the Preliminary Agreement also required execution of a stipulation of discontinuance.  The Draft merely adds a date by which the stipulation must be executed, and it makes clear that the settlement payments are in consideration for Steinfeld's execution of such stipulation.  Nothing in such language indicates that execution of the stipulation or the payments were not required by the Preliminary Agreement.  Similarly, Steinfeld also puts forth the unpersuasive argument that the parties' agreement to execute the general releases subsequent to entering into the Preliminary Agreement signaled an express reservation of the right not to be bound by the Preliminary Agreement.  See Melwani v. Jain, 2004 WL 936814, *5 (S.D.N.Y. 2004).

Although a number of factors may be considered to indicate that the parties did not intend to be bound by the Preliminary Agreement, these factors do not overcome its express language.  Further, the parties' joint communication to Judge Seibel's chambers that the matter

16

had settled, made shortly after entering into the Agreement, is strong evidence that the parties intended to be bound by the Agreement.

### 2.    Agreement to All Essential Terms

The Court next looks to the <u>Winston</u> factor of whether the Preliminary Agreement reflects an agreement by the parties as to all essential terms.  <u>Winston</u>, 777 F.2d at 80.  In other words, it looks to see "whether there was literally nothing left to negotiate or settle, so that all remained to be done was to sign what had already been fully agreed to." <u>R.G. Group,</u>, 751 F.2d at 76.  Typically, "although the parties may intend to enter into a contract, if essential terms are omitted from their agreement, or if some of the terms included are too indefinite, no legally enforceable contract will result." <u>V'Soske</u>, 404 F.2d at 500.  A term left open by the parties will not preclude the court from concluding that a preliminary agreement is binding if such open "term has a well defined meaning and provides a method of valuation by which the exact amount contemplated can be determined." <u>Id.</u> at 500.  On the other hand,

> minor or technical changes arising from negotiations over the written language of an agreement can weigh against a conclusion that the parties intended to be bound absent a formal writing . . . if they show that there were points remaining to be negotiated such that the parties would not wish to be bound until they synthesized a writing satisfactory to both sides in every respect.

<u>Powell</u>, 497 F.3d at 130 (internal quotation marks and citation omitted).

Steinfeld argues that he and IMS did not finally resolve the scope of the general releases, which he characterizes as essential to the settlement agreement.  Again, the Preliminary Agreement required the parties to "execute mutual general releases together with a Stipulation of Discontinuance of the Litigation with Prejudice as part of the formal settlement agreement.  The general release in favor of IMS shall extend to its parent, subsidiaries, and affiliates, and to its and their officers, directors, employees and agents." Docket Entry #102, Exh. 2, August 23,

17

2013, 3:15 PM e-mail.  Steinfeld contends that the parties now interpret the promised releases in

divergent fashions, claiming that such disagreement is evidence that they never agreed upon the

meaning of such releases in the first place.  See Docket Entry #104, Memo. of Law in Opp. at

12.

      When interpreting a settlement agreement, a court must strive to effectuate the intent of

the parties by first looking to the agreement's terms.  Citizens Bank and Trust Co. v. Se-Fish

Associates, 2003 WL 22383564 (W.D.N.Y. 2003).  "Where, however, the meaning of a word or

phrase is ambiguous, the courts of New York will examine the record as a whole in an effort to

interpret the agreement so as to effectuate the intent of the parties."  Bank of New York v.

Amoco Oil Co., 35 F.3d 643, 661 (2d Cir. 1994); see National Union Fire Ins. Co. Of Pittsburgh,

Pa. v. Walton Ins. Ltd., 696 F.Supp. 897, 901 (S.D.N.Y. 1988); Reiss v. Financial Performance

Corp., 97 NY2d 195, 199 (2001) ("courts may not by construction add or excise terms, nor

distort the meaning of those used and thereby make a new contract for the parties under the guise

of interpreting the writing." (internal quotation marks and citation omitted)); Carney, 16 AD3d at

868 (A settlement agreement "must be enforced according to its terms, without reference to

extrinsic evidence unless the terms are ambiguous.").  "Where one interpretation is broader than

another, courts should not apply the broader interpretation absent a clear manifestation of

intent."  Bank of New York, 35 F.3d at 662.  Further, "where contracts are negotiated by counsel

for sophisticated commercial parties, courts should interpret ambiguous language to realize the

reasonable expectations of the ordinary businessperson."  Id.

    Steinfeld claims that the parties intended the releases only to pertain to the claims in

dispute or in existence at the time their execution.  He thus contends that the release called for by

the Preliminary Agreement was not intended to terminate the Employment or Amended Change-

in-Control Agreements.  IMS takes the opposite view.  See Docket Entry #103, Memo. of Law at
11.  It claims that, as a result, Steinfeld released IMS from "*all* contractual obligations," id.
(emphasis in original), including its obligations to (1) pay the health insurance premiums of
Steinfeld and his family, (2) reimburse Steinfeld for certain legal fees, and (3) indemnify
Steinfeld from certain tax liabilities.  See Docket Entry #103, Memo. of Law at 11.  Despite the
parties' current claims about their differing intents, "it is not a parties' [sic] subjective intent that
controls, but rather what the parties said (and/or did)."  Hostcentric, 2005 WL 1377853 at *5; see
Clark v. Buffalo Wire Works Co., Inc., 3 F.Supp.2d 366, 373 (W.D.N.Y. 1998) ("if the language
of a contract, including a release, is clear and unambiguous 'effect will be given to the intention
of the parties as indicated by the language employed and the fact that one of the parties may
have intended something else is irrelevant.' " (quoting LeMay v. H.W. Keeney, Inc., 124 AD2d
1026, 1026 (4th Dept. 1986))).

The parties' promise in the Preliminary Agreement to exchange mutual general releases is
facially complete "because judges and lawyers know the customs and practices of the profession
and need consult no expert to know the nature and intended effect of a standard form so common
as a general release."  Okemo Mountain, Inc. v. U.S. Sporting Clays Ass'n, 376 F.3d 102, 109
(2d Cir. 2004); see Hostcentric, 2005 WL 1377853 at *8 (agreement to exchange mutual general
releases did not leave open term).  "[A] valid release constitutes a complete bar to an action on a
claim which is the subject of the release."  National Union Fire Ins. Co. Of Pittsburgh, Pa. v.
Walton Ins. Ltd., 696 F.Supp. 897, 901 (S.D.N.Y. 1988); accord Spanski Enterprises, Inc. v.
Telewizja Polska, S.A., 2013 WL 81263, *4 (S.D.N.Y. 2013).  Typically, "[a] general release is
a release that covers all claims and demands due at the time of its execution."  Melwani, 2004
WL 936814 at *6 (internal quotation marks and citation omitted); see Clark, 3 F.Supp.2d at 372-

73. In Melwani, the court held that the plaintiff, in signing a general release similar to that called for the by the Preliminary Agreement, "agreed that he would not thereafter assert any type of claim against [the defendant], to the extent such claim arose from [the defendant's] conduct prior to the date of the settlement." 2004 WL 936814, at *7.

IMS's argument that Steinfeld released it from "*all* contractual obligations," Docket Entry #110, Reply Memo. of Law at 10 (emphasis in original), however, is an overbroad interpretation of the release called for by the Preliminary Agreement. Under such anticipated release, Steinfeld did not release IMS from any obligations, only claims. Further, he only released those claims against that had accrued prior to or at the time of the execution of the anticipated release.

IMS points to Imprimis Investors LLC v. U.S., 83 Fed. Cl. 46 (2008); Matter of Schlaifer v. Sedlow, 51 NY2d 181 (1980); and Mosberg v. National Prop. Analyst, 217 AD2d 482 (1st Dept. 1995), to support its position that a general release in a contract action typically terminates the underlying contract. Such decisions, however, are easily distinguishable.

The release at issue in Imprimis, which terminated a party's rights under a partnership agreement, explicitly stated that parties were releasing "(a) claims, rights or obligations relating directly or indirectly to any of the Relevant Agreements and (b) any and all claims, counterclaims or third-party claims asserted or that could have been asserted in the Actions." 83 Fed. Cl. At 65. Moreover, the settlement agreement connected with the release stated that the parties wished "to settle and terminate all of their disputes, including without limitation, their rights under the Relevant Agreements." Id. at 50. Here, the release called for by the Preliminary Agreement made no mention of either of the contracts at issue, and, therefore, it is not comparable to the release in Imprimis.

In <u>Matter of Schlaifer v. Sedlow</u>, 51 NY2d 181 (1980), a New York State Court of Appeals decision, the defendant entered into a stockholders agreement and an employment contract with the plaintiff corporation; both contracts contained arbitration clauses.  <u>See id.</u> at 183-84.  After a dispute concerning the stockholders agreement arose between the parties, they settled the matter for a sum of money and defendant executed a "familiar form of boiler plate general release, releasing all claims from the beginning of the world to the date of the release with no mention made of either the stockholders agreement or the agreement of employment." <u>Id.</u> at 184.  The defendant thereafter sought arbitration of a claim of entitlement to profits under the arbitration clauses of both contracts.  <u>See id.</u>  The plaintiff argued that the defendant's execution of the releases terminated both contracts, including the arbitration clauses.  <u>See id.</u> The court held that the "character and function of a general release" meant that such boilerplate general releases only released the plaintiff from the substantive provisions of the contracts, not the arbitration clauses, which it held were separable.  <u>Id.</u>  The court's analysis focused mainly on why a general release arising from a contract dispute applies only to substantive provisions of a contract whereas an agreement to fully cancel the contract is necessary to invalidate a procedural clause, such as an arbitration provision.  <u>See id.</u> at 184-85.  The court stated that "[a] general release is based on the assumption that there was a prior valid agreement out of the substantive provisions of which certain asserted claims had arisen, and manifests a subsequent agreement pursuant to which those claims have been given up and released." <u>Id.</u> at 185.  It added that, "[i]n legal effect then a general release accompanying a settlement of a substantive dispute is a form of contract termination with respect to the substantive rights of the parties under the original agreement."  <u>Id.</u>

21

The decision, however, does not provide guidance here because the defendant did not dispute that he intended to release the plaintiff from all claims and obligations under the contracts. See id. at 186-87. The dissent in Matter of Schlaifer makes such detail clear when it explains that the defendant fully acknowledged his intent to release all substantive rights under the contracts. See id. at 187. Therefore, while the language of the majority's decision appears to support IMS's contention, the applicability of the release to the substantive provisions of the contracts was not at issue. Thus, the decision is not controlling here.

In Mosberg, the plaintiff and other investors in a limited partnership settled a prior action against the general partner defendant, which included the plaintiff's release of the defendant from "any and all suits, claims, demands, debts, liabilities, obligations, promises or controversies which any of the members of the Settlement Class . . . ever had, now have or may hereafter have, . . . by reason of, based upon, or arising out of or in connection with, directly or indirectly . . . the Partnerships [or] the operations of the Partnerships . . . " 217 AD2d at 483. The court held that such agreement extinguished the plaintiff's right under the Partnership Agreement to exercise a Partner Put Option, which was the basis of the instant suit. The facts in Mosberg are easily distinguishable because the release at issue there specifically released the defendant from any claims, liabilities, debts, or obligations under the Agreement. Here, the Preliminary Agreement merely provided for an exchange of mutual general releases, which typically apply to any claims that exist at the time of the release, not to obligations under an existing contract.

Additionally, IMS argues that the circumstances surrounding the formation of the Preliminary Agreement evidence that the anticipated release was intended to terminate the Employment Agreement and the Amended Change-in-Control Agreement. Specifically, IMS points to its August 23, 2013, e-mail in which it stated that it was neither indemnifying Steinfeld

22

for any tax liability nor making any representations as to tax matters.  <u>See</u> Docket Entry #105,

Exh. 10, August 23, 2013, 11:34 AM e-mail.  IMS claims that, because it was obligated to

indemnify Steinfeld for certain tax liabilities under section five of the Employment Agreement,

its disclaimer of such obligations in the e-mail made clear that it intended any release to

terminate such obligation.

Insofar as the aforementioned e-mail may be read to indicate that IMS wished to dispose

of its ongoing obligations to Steinfeld, it is of little consequence because the totality of the

circumstances surrounding the execution of the Preliminary Agreement show no intent by the

parties to terminate the Employment Agreement or the Amended Change-in-Control Agreement

through the execution of the mutual general releases.  Indeed, the Preliminary Agreement

purports to contain the essential terms of the parties' understanding, and yet it is silent on this

subject.  The lawsuit does not concern the validity of either the Employment Agreement or the

Amended Change-in-Control Agreement; it instead concerns the applicability of certain

provisions of such contracts in light of Steinfeld's exit from IMS.  Further, the discussions

surrounding the Preliminary Agreement did not pertain to IMS's future obligations under the

agreements.  The parties' election not to discuss Steinfeld's rights under the contracts in the

course of the settlement negotiations or to reference such rights in the Preliminary Agreement

inherently excluded them from the releases contemplated in the Preliminary Agreement.

Therefore, such terms were outside the understanding of the parties at the time they entered into

the Preliminary Agreement.

At the time of the formation of the Preliminary Agreement, Steinfeld had no claim

relating to IMS's failure to pay legal fees and health insurance following the execution of the

release contemplated in the Preliminary Agreement.  There is no statement in the clause

discussing such release that states that Steinfeld elected to forego future reimbursement of legal

fees or payment of health insurance; it instead states only that Steinfeld was releasing those

claims that had accrued at the time of the release. Thus, construing the language of the release

clause in the Preliminary Agreement and circumstances surrounding its execution in a manner

intended "to give effect to the intent of the parties," Ruskay v. Waddell, 552 F.2d 392, 395 (2d

Cir. 1977), it can only be concluded that the parties did not intend for Steinfeld to release IMS

from its prospective obligations under the Employment Agreement of the Amended Change-in-

Control Agreement. See Benicorp. Ins. Co. v. National Medical Health Card Systems, Inc., 447

F.Supp.2d 329, 339 (S.D.N.Y. 2006) (the court held that release only covered then-existing

claims because nothing in the release language "demonstrates that [the plaintiff] actually

intended to relinquish future claims.").

Steinfeld lastly urges that the fourth clause of the Preliminary Agreement, which called

for a formal written agreement with typical boilerplate provisions, left essential terms open for

future negotiation. See Docket Entry #104, Memo. of Law in Opp. at 15-16. He stresses that

IMS's inclusion in the Draft of a merger clause, a choice of law provision, a confidentiality

clause, and a revocation clause, were attempts to insert new essential terms into the Preliminary

Agreement. See id. at 16. IMS, in response, states that "[t]he only items that were left open by

the parties on August 23rd were what they referred to as the 'typical "boilerplate" provisions

found in such agreements.' " Docket Entry #110, Reply Memo. of Law at 11 n 26 (quoting

Docket Entry #102, Exh. 2, August 23, 2013, 3:15 PM e-mail).

Boilerplate language is defined as (1) "Ready-made or all-purpose language that will fit

in a variety of documents" or (2) "Fixed or standardized contractual language that the proposing

party often views as relatively nonnegotiable." Black's Law Dictionary (9th ed. 2009). The

24

materiality of boilerplate language is debatable.  On its face, the fourth clause of the Preliminary Agreement's reference to the missing language as "typical 'boilerplate' " intimates that it would have no material effect on the agreement, and, therefore, the clause appears facially complete as to essential terms.

IMS's inclusion of a merger clause, choice of law provision, confidentiality clause, and rescission clause in the draft Settlement Agreement is, however, some evidence to the contrary. Regardless of whether such terms consist of only boilerplate, ready-made language, they are material in that they would significantly affect the interpretation of and any litigation over the settlement agreement.  However, no writings made prior to or contemporaneously with the Preliminary Agreement indicate that the parties anticipated future negotiation of such terms. Therefore, IMS's insertion of such terms and invitation for comment seems nothing more than an attempt to unilaterally amend the agreement.

While the new material terms in the Draft is some evidence that the parties intended to negotiate terms subsequent to formation of the Preliminary Agreement, such evidence does not outweigh the facial completeness of the Preliminary Agreement.  The language of the Preliminary Agreement contains all of its essential terms and indicates no future substantial negotiations.  Therefore, this factor weighs in favor of concluding that the parties intended the preliminary agreement to bind them.

### 3.      Partial Performance

There has been little, if any, performance of the Preliminary Agreement.  IMS points to the parties' communication to Your Honor's chambers that the case had settled, characterizing such action as partial performance of the agreement to discontinue of the matter.  See Docket Entry #110, Reply Memo. of Law at 12.  Inasmuch as such communication may be characterized

as partial performance of the Preliminary Agreement, it is slight at best.  No payments have been made under the terms of the agreement.  Further, the parties have not executed mutual general releases, executed a stipulation of discontinuance, or reduced the Preliminary Agreement to a formal written instrument.  Inasmuch as IMS believed that Steinfeld released it from its obligations under the Employment Agreement, it is arguable that IMS's cessation of paying health insurance payments for Steinfeld or his family or reimbursing Steinfeld's legal fees may be partial performance.  However, as discussed above, such construction of the release is incorrect.  At bottom, this factor weighs against conclusion that the parties intended to be bound by the Preliminary Agreement.

### 4.     Whether the Agreement is One Usually Committed to Writing

This Winston factor weighs in favor of a conclusion that the Preliminary Agreement was not meant to bind the parties thereto.  Winston, 777 F.2d at 80.  IMS correctly notes that there was a writing in the form of the August 23, 2013, e-mail exchange.  See Docket Entry #110, Reply Memo. of Law at 13.  Steinfeld counters that a number of cases indicate that an "such e-mail exchanges do not create an enforceable agreement where they do not otherwise satisfy the Winston factors."  Memo. of Law in Opp. at 18 (citing VPP, 2006 WL 4730944, at *4; Rubinstein v. Clark & Green, Inc., 395 Fed Appx. 786, 788 (2d Cir. 2010); Horphag, 115 F.Supp.2d at 457).[4]

---

[4]  In the Memorandum of Law in Opposition to the motion, Steinfeld's counsel supports his claim that this settlement was not binding until reduced to a formal agreement with a citation to the Second Circuit's decision in R.G. Group, Inc., 751 F.2d at 77.  Arguing that the sum of money at issue here requires a formal written agreement, the Memorandum quotes the decision in R.G. Group, Inc. as follows: "with [$2 million] at stake, a requirement that the agreement be in writing and signed simply cannot be a surprise to anyone."  Docket Entry #104, Memo. of Law in Opp. at 19 (quoting 751 F.2d at 77).  However, the full quotation from the Second Circuit's decision is as follows: "Perhaps most telling is the fact that the parties were talking

When evaluating whether a settlement agreement is of the type typically reduced to writing, the court should look to the complexity of the agreement, the amount of money at stake, and the length of time necessary for performance.  See Adjustrite, 145 F.3d at 551 ("In view of the size of the transaction, the nature of the assets being purchased, and the length of the contemplated employment contracts, the Agreement clearly was of the type that ordinarily would be committed not only to a writing but to a formal contract complete with representations and warranties and the other standard provisions usually found in sophisticated, formal contracts.").

IMS correctly points out that the e-mails memorialized all of the essential terms of the agreement: the payment amounts, the payment schedule, the stipulation to discontinue the action with prejudice, and the promise to exchange mutual general releases.   However, in Rubinstein, the Second Circuit held that a preliminary settlement agreement, set forth in a series of e-mails, was of the kind typically reduced to a formal writing because the parties contemplated setting forth the terms in a standard contract, the resulting construction contract was worth up to $1.5 million, the contemplated work would take place over the span of more than one year, and the structure of the terms was complicated.  395 Fed Appx. at 790.  Similarly, the agreement here concerned a substantial amount of money ($2,205,000) to be paid over a lengthy period of time (seven years), and, therefore, a formal writing was appropriate.

---

about an initial investment of some two million dollars, and that the plaintiffs' complaint alleges lost income, profits, and injuries of 'at least' least eighty million dollars.  With that amount of money at stake, a requirement that the agreement be in writing and signed simply cannot be a surprise to anyone."  R.G. Group, Inc., 751 F.2d at 77.  The full quotation makes clear that the court's discussion of the "amount of money at stake," id.,was a reference to the sum of eighty million dollars, and not the smaller sum of two million dollars.

**5.      The Parties Intended to be Bound by the Preliminary Agreement**

The issue of whether the Preliminary Agreement was meant to bind the parties is a close question.  The first and second <u>Winston</u> factors weigh in favor of a conclusion that the parties intended to be bound by the agreement, but the third and fourth factors go the other way.  As previously noted, the first factor, the express language of the agreement, is the most important in such an evaluation, and it indicates that the parties intended to be bound by the agreement. Thus, such factor, in conjunction with the fact that the agreement has no open essential terms, indicates that the parties intended the Preliminary Agreement to be binding.  Accordingly, I conclude, and respectfully recommend that Your Honor conclude, that the parties intended that the Preliminary Agreement would bind them.

**D.      The Parties Operated Under a Mutual Mistake**

Steinfeld argues that even if the parties meant themselves to be bound by the Preliminary Agreement, it should be rescinded on the basis of mutual mistake.  Specifically, Steinfeld claims that the parties structured the annual $315,000 payments over the course of seven years under the belief that Steinfeld would only be taxed on the amount that he received each year.  <u>See</u> Docket Entry #104, Memo. of Law in Opp. at 21-22.  However, Steinfeld apparently thereafter learned that 26 CFR § 1.409A-3(g) required the payment of the entire settlement amount in the tax year in which the agreement was finalized.  He claims that the agreement's violation of 26 CFR § 1.409A-3(g) would result in a tax penalty under 26 U.S.C. § 409(a)(1)(B)(i)(II).  For the reasons stated below, I conclude, and respectfully recommend that Your Honor should conclude, that Steinfeld has established by clear and convincing evidence that the parties entered into the Preliminary Agreement under a mutual mistake, and, consequently, the agreement is voidable.

Rescission of a contract is generally available when the parties enter into the agreement under a mutual mistake of fact.  Gould v. Board of Educ. of Sewanhaka Cent. High School Dist., 81 NY2d 446, 453 (1993).  "A mutual mistake occurs when both parties to a bilateral transaction share the same erroneous belief and their acts do not in fact accomplish their mutual intent."  Warner Theatre Assoc. Ltd. Partnership v. Metropolitan Life Ins. Co., 1997 WL 685334, *7 (S.D.N.Y. 1997) (internal quotation marks, ellipses, and citation omitted) (Opn. by Sotomayor, J.).  "The mutual mistake must exist at the time the contract is entered into and must be substantial."  Id.; accord Carney, 16 AD3d at 868.  Rescission of a contract on the basis of mutual mistake is only available when the contract is still executory or the parties may be returned to the status quo.  See D'Antoni v Goff, 52 AD2d 973, 974 (3d Dept. 1976).

Courts presume "that a deliberately prepared and executed written instrument manifests the true intention of the parties."  Chimart Assoc. v Paul, 66 NY2d 570, 574 (1986) (internal quotation marks, brackets, and citations omitted).  Therefore, to obtain relief from a contract on the basis of mutual mistake, a party must show that the mistake is one that "is mutual, substantial, material and exists at the time the contract is entered."  Rodriguez v. Mower, 56 AD3d 857, 858 (3d Dept. 2008).

When evaluating a claim of mutual mistake, "neither the parol evidence rule nor the Statute of Frauds applies to bar proof, in the form of parol or extrinsic evidence, of the claimed agreement."  Chimart, 66 NY2d at 573.  Consequently, a mutual mistake argument creates "the danger that a party, having agreed to a written contract that turns out to be disadvantageous, will falsely claim the existence of a different, oral contract."  Id.  Accordingly, proof of [mutual] mistake must be "of the highest order," [and it] must "show clearly and beyond doubt that there has been a [mutual] mistake."  Janowitz Bros. Venture v 25-30 120th St. Queens Corp., 75 AD2d

203, 215 (2d Dept. 1980) (quoting 13 Williston, Contracts § 1548 at 125 (3d ed)); see Chimart,
66 NY2d at 574.

      The e-mail exchange between counsel for Steinfeld and IMS makes clear that the parties
negotiated a series of annual payments so that Steinfeld could receive a larger settlement sum,
while IMS could minimize its losses by spreading the payments over a number of years.  While
the parties negotiated whether the payments would come from an annuity or directly from IMS,
Steinfeld's counsel repeatedly stressed that Steinfeld desired a settlement structure which would
only expose him to annual tax liability on the payment that he received that year.  See Docket
Entry #105, Exh. 5, August 22, 2013, 7:53 PM e-mail.  Restated, Steinfeld repeatedly affirmed
that he did not want to be liable for taxes on the total settlement amount in the first tax year
because the payments from the agreement were to be spread over a number of years.  See id.
When discussing how the parties would structure the proposed annuity, Steinfeld's counsel asked
IMS's counsel to "confirm that this annuity arrangement is intended to meet [Steinfeld's]
objective of being taxed only on $315K per year for each of the seven years beginning in 2014,
and that it can be structured to meet that objective."  Id.

      IMS's counsel responded to the concern by forwarding to Steinfeld's counsel an e-mail
from a "tax partner" at the law firm of IMS's counsel.  See Docket Entry #105, Exh. 7, August
23, 2013, 8:52 AM e-mail.  In the e-mail, the tax attorney noted that "the issue is whether the
IRS could treat Mr. Steinfeld as having constructively received (in the year of the settlement) the
approximate 315K amounts to be paid in each of the seven years beginning in 2014."  Id.  He
observed that Steinfeld "is a cash-basis taxpayer and thus he normally would not be taxed on
amounts to be paid to him in future years."  Id.  The tax attorney then looked to Treasury
Regulation § 1.451-2, which provides:

Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. Thus, if a corporation credits its employees with bonus stock, but the stock is not available to such employees until some future date, the mere crediting on the books of the corporation does not constitute receipt . . .

He went on to discuss at length a number of IRS rulings concerning whether Steinfeld could be taxed on the gross amount of an annuity. The tax attorney concluded that, "absent Mr. Steinfeld having a right to receive the present discounted value of the monthly payments, to control the investment or, accelerate, increase, or decrease the amount or some other indicia of control, the foregoing authority should apply and he should be taxable only as to the $315K amounts in each of the seven years received." Docket Entry #105, Exh. 7, August 23, 2013, 8:52 AM e-mail.

Steinfeld's counsel made clear that

so long as our formal settlement agreement (consistent with your proposal below and our email exchange this morning) will include a covenant that Steinfeld shall be subject to tax only in the tax years in which each $315,000 payment is actually paid to, and received by, Steinfeld and only on such $315,000 payment, I can confirm agreement, on Mr. Steinfeld's behalf, to the terms of the proposal set forth below.

Docket Entry #105, Exh. 9, August 23, 2013, 11:17 AM e-mail. IMS's counsel, however, responded that IMS would neither indemnify Steinfeld for any tax liability nor make any representations as to tax matters other than to state that IMS would own the annuity and Steinfeld would have no ability to control the annuity or obtain early payments therefrom. Docket Entry #105, Exh. 10, August 23, 2013, 11:34 AM e-mail. IMS's counsel followed up, stating that, according to his tax partner, the proposed annuity "should work just fine for [Steinfeld] from a tax perspective." Docket Entry #105, Exh. 11, August 23, 2013, 1:08 PM e-mail. In the following sentence, IMS's counsel alternatively proposed doing away with the

31

annuity, stating that IMS was willing to make direct annual payments to Steinfeld. See id. Steinfeld's counsel responded that Steinfeld would agree to direct payments from IMS, "take the credit risk and give up acceleration on a change in control [for] $325K per year for seven years." Docket Entry #105, Exh. 12, August 23, 2013, 2:37 PM e-mail. IMS's counsel then responded with the aforementioned 3:15 PM e-mail setting forth the terms of the Preliminary Agreement, to which Steinfeld's counsel responded that he agreed to such terms.

The aforementioned e-mails make clear that Steinfeld agreed to equal annual payments over the course of seven years in the belief that he would only be liable for taxes on each $315,000 payment in the year it was remitted to him. Steinfeld's belief, however, was mistaken. 26 CFR § 1.409A-3(g) requires that the entirety of the settlement amount be transferred to Steinfeld "no later than the end of the first taxable year . . . in which the [parties] enter into a legally binding settlement of such dispute . . ." Deferring receipt of such gross income over the course of several years would, therefore, be improper, and, as a result, the entire amount would be taxable within the first year, and it would be subject to a 20% penalty. 26 U.S.C. § 409A(a)(1)(B)(i)(II).

IMS argues that it did not share Steinfeld's mistaken belief as to the resulting tax liability, stating that "[w]hile IMS certainly understood that [Steinfeld] wanted to minimize his tax burden, IMS did not know whether the payment structure [Steinfeld] insisted upon would, or would not, accomplish his objective – nor did IMS care." Docket Entry #110, Reply Memo. of Law at 13. IMS contends that it "made it crystal clear during the parties' negotiations that Steinfeld, and Steinfeld alone, bore responsibility for the tax consequences to himself of the settlement." Docket Entry #103, Memo. of Law at 14. IMS added that it "therefore understandably paid no attention to those [tax] consequences." Id.

Whether IMS cared about Steinfeld's resulting tax liability is of no consequence.  Further, its statement that it paid no attention to any resulting taxes is demonstrably false.  The tax partner in IMS's counsel's law firm prepared the aforementioned e-mail analyzing the tax liability connected with the payment structure in order to reassure Steinfeld.  Although the e-mail was written in the context of the proposed annuity, it emphasized that Steinfeld would be free from tax liability on the entire amount in the first year as long as he did not have "a right to receive the present discounted value of the monthly payments, to control the investment or, accelerate, increase, or decrease the amount or some other indicia of control."  Docket Entry #105, Exh. 7, August 23, 2013, 8:52 AM e-mail.  Such representation was made in response to an inquiry by Steinfeld's counsel as to the resulting tax consequences of the proposed agreement.  Thus, the e-mail was communicated by IMS's counsel with the intent that Steinfeld would rely on the opinions contained therein, and would entered into the Preliminary Agreement, as he did.  Consequently, IMS's argument now that Steinfeld, as a tax attorney, should have been aware of the resulting tax consequences, see Docket Entry #110, Reply Memo. of Law at 13, is not persuasive.

IMS's subsequent comment that designating Steinfeld as a beneficiary to the annuity "should work just fine for [Steinfeld] from a tax perspective," Docket Entry #105, Exh. 11, August 23, 2013, 1:08 PM e-mail, further indicated the understanding of both IMS and Steinfeld that Steinfeld would only be liable for the taxes on the payments he received each year.  In the following sentence, IMS's counsel proposed that IMS could, instead, make direct payments to Steinfeld.  IMS's counsel was aware of Steinfeld's apprehension concerning tax liability, and counsel's proposal of direct payments made no mention of different tax consequences, thereby signaling that such proposal would similarly accord with Steinfeld's preference.

Taken together, such e-mails establish that IMS was aware Steinfeld wished only to be liable for taxes on each $315,000 payment in the year that he received it. In addition, they establish that IMS believed Steinfeld's tax liability concerns would be met by either payment arrangement as long as Steinfeld had no "right to receive the present discounted value of the monthly payments, to control the investment or, accelerate, increase, or decrease the amount or some other indicia of control." Docket Entry #105, Exh. 7, August 23, 2013, 8:52 AM e-mail. Moreover, IMS does not assert that it ever understood the tax consequences of the settlement agreement to differ from the mistake alleged by Steinfeld.

The e-mails further establish that Steinfeld relied on the statements provided by the tax partner to IMS's counsel. IMS agreed to provide Steinfeld's counsel with legal input on the tax liabilities of the annuity structure despite Steinfeld's experience in the field, and IMS should have understood that Steinfeld would rely on such input. If IMS did not want Steinfeld to rely on its representations, it should have directed him to consult a tax attorney on his own to discover any tax implications. Therefore, Steinfeld has established that the parties shared an erroneous belief about the resulting tax consequences of the Preliminary Agreement, See Yurman Design, Inc. v. Garden Jewelry Mfg. Corp., 2003 WL 22047896, *3 (S.D.N.Y. 2003), which went "to the foundation of the agreement." Simkin v. Blank, 19 NY3d 46, 52 (2012) (internal quotation marks and citation omitted). As discussed previously, the agreement remains executory, and, therefore, the parties may be returned to the status quo through rescission of the preliminary agreement. Accordingly, I conclude, and respectfully recommend that Your Honor conclude, that the Preliminary Agreement is void due to mutual mistake.

E.      **Steinfeld's Counsel Did Not Lack Authority to Bind Him to the Preliminary Agreement**

Steinfeld also asserts that his attorney "lacked authority to enter into a binding settlement agreement on Steinfeld' behalf." Docket Entry #104, Memo. of Law in Opp. at 23. However, in an affidavit submitted to support his opposition to the subject motion, Steinfeld states: "[a]lthough [my attorney] was authorized to confirm on my behalf the parties' preliminary understanding regarding a settlement, he was not authorized to sign off on the parties' final enforceable agreement." Docket Entry #106, Steinfeld Affid. At ¶ 6 (emphasis omitted). The motion at issue concerns whether the Preliminary Agreement is enforceable. Steinfeld's acknowledgment that his attorney was authorized to confirm such Preliminary Agreement is also an acknowledgment that his attorney had authority to bind him to that Preliminary Agreement if it was intended by the parties to be binding. Thus, this assertion is without merit.

F.      **The Effect of the General Release**

IMS contends that the promise in the Preliminary Agreement to exchange mutual releases extinguished all of Steinfeld's rights under the Employment Agreement and the Amended Change-in-Control Agreement, including his entitlement to (1) certain tax indemnification by IMS, (2) the payment of certain health care premiums by IMS, and (3) the reimbursement by IMS for certain legal fees. See Docket Entry #103, Memo. of Law at 11-12. As discussed supra, a general release is commonly understood as "a release that covers all claims and demands due at the time of its execution." Melwani, 2004 WL 936814 at *6 (internal quotation marks and citation omitted); accord Spanski, 2013 WL 81263 at *4. Therefore, Steinfeld's agreement to execute a general release, as commonly understood, only released IMS from any claim accrued at that moment. It did not terminate the Employment Agreement or the

Amended Change-in-Control Agreement, and it did not release from IMS from its subsequent obligations under such agreements. Thus, I conclude, and respectfully recommend that Your Honor conclude, that under the reasonable expectations of the ordinary businessperson, the exchange of general releases was not intended to release IMS from its future obligations under the Employment Agreement or the Amended Change-in-Control Agreement.

## IV.   CONCLUSION

For the reasons stated above, I conclude, and respectfully recommend that Your Honor should conclude, that IMS's motion to enforce the settlement agreement should be denied. In the event that Your Honor disagrees with my recommendation and grants IMS's motion to enforce the settlement agreement, I conclude, and respectfully recommend that Your Honor should conclude, that Steinfeld's execution of the general release discussed in the Preliminary Agreement would not release IMS from its subsequent obligations under the Employment Agreement or the Amended Change-in-Control Agreement.

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days, plus an additional three (3) days, pursuant to Fed. R. Civ. P. 6(d), or a total of seventeen (17) days, see Fed. R. Civ. P. 6(a), from the date hereof, to file written objections to this Report and Recommendation. Such objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the Chambers of the Honorable Cathy Seibel at the Hon. Charles L. Brieant Jr. Federal Building and Courthouse, 300 Quarropas Street, White Plains, New York, 10601, and to the Chambers of the undersigned at the same address. Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Seibel, and should not be made to the undersigned.

Dated: February 14, 2014
      White Plains, NY

Respectfully submitted,

Lisa Margaret Smith
United States Magistrate Judge
Southern District of New York

A copy of the foregoing Report and Recommendation has been sent to the following:

Honorable Cathy Seibel, U.S.D.J.

David G. Ebert
Dean G. Yuzek
Jennifer B. Zourigui
Ingram Yuzek Gainen Carroll & Bertolotti, LLP
250 Park Avenue
New York, NY 10177

Anne C. Lefever
Kenneth W. Taber
Pillsbury Winthrop Shaw Pittman, LLP (NY)
1540 Broadway
New York, NY 10036